## HARMON *v.* HARMON.

## Opinion delivered December 17, 1917.

1.  GIFT—GIFT INTER VIVOS.—Where a gift is made not in contemplation of death, but to take effect and become complete immediately upon the delivery and the taking possession of the property by the donee, the gift is one *inter vivos*, notwithstanding the donor may be upon his deathbed.

2.  GIFTS—CAUSA MORTIS—PRESUMPTION—MAY BE OVERCOME.—When a gift is made by one who is afflicted with a fatal malady and who at the time of the making of the gift has no hope of recovery, and where the gift is made in contemplation of the near approach of death, the presumption is that such gift was *causa mortis;* but this presumption may be overcome by proof to the contrary.

3.  GIFTS—INTER VIVOS—RIGHT OF DONOR'S WIDOW.—Where deceased, by gift *inter vivos,* gave certain personal property to his sons, although deceased at the time was upon his deathbed, thereafter his widow has no right in the property given, either as widow or as administratrix.

4.  CONTRACTS—WRITING—PAROL EVIDENCE TO VARY.—Evidence is inadmissible to prove that a plain promissory note, payable under the law in money, was under the terms of a contemporaneous parol agreement, to be paid partly in merchandise.

Appeal from Franklin Chancery Court, Ozark District; *W. A. Falconer,* Chancellor; affirmed.

*Winchester & Martin* and *J. P. Clayton,* for appellants.

1. If the father of S. W. Harmon did give his estate to his sons, did they as an inducement to C. G. Harmon to buy the interest of S. W. in the business, agree that they would trade with him and that their accounts should be credited on the notes? If made the defendants can enforce in this suit.

Such an agreement was made as an inducement to buy. The evidence supports the contention. No effort was made to alter, vary or modify a written contract, but the evidence tended to establish this as a collateral agreement. 102 Ark. 669; 27 *Id.* 510; 17 Cyc. 713. To the extent of the amounts due from Silas and Henry Harmon, the consideration of the notes has failed. Oral proof is

competent to show want or failure of consideration. 105 Ark. 281; 90 *Id.* 272; 27 *Id.* 510; 55 *Id.* 112. See also, 2 Wharton on Ev., § 1015; 27 Ark. 515.

2. Plaintiffs are not innocent purchasers and credit should be given for the accounts of Silas and Henry. 99 Ark. 458.

3. J. T. Harmon, the heir of S. W., did not give the estate of his deceased son to plaintiffs. The widow interpleader was entitled to collect these notes and to dower. 60 Ark. 169. The intention to give must be accompanied by delivery. 3 Pom. Eq. Jur., § 1149; 59 Ark. 194. There is no evidence of a gift. 60 Ark. 169; If a gift *causa mortis* the widow has dower. *Ib.*

The equities are with defendant and the interpleader and the decree should be reversed.

*G. O. Patterson,* for appellees.

1. No such agreement as contended for was made, but if made, it was not enforceable. Parol evidence was inadmissible. 73 Ark. 431; 49 *Id.* 285; 20 *Id.* 293; and many others.

2. Appellees were innocent purchasers.

3. A valid gift was made by J. T., the heir of S. W. Harmon. It was *inter vivos.* 60 Ark. 169; 93 *Id.* 548. The widow could have no dower. *Ib.*

### STATEMENT OF FACTS.

J. T. Harmon died intestate on the 29th day of October, 1913. He was survived by his widow, Martha Harmon, and his sons, Frank, Henry, John and Silas. He had another son, Sid W. Harmon, whose death occurred before that of his father, towit, August 21, 1913, leaving J. T. Harmon (his father) as his only heir. At the time of S. W. Harmon's death he was equally interested as a partner in a mercantile business with one C. G. Harmon, and this mercantile business was conducted at Marble Hill, Franklin County, Arkansas, under the firm name of Harmon and Harmon.

At the time of the death of S. W. Harmon he owned, besides the half interest in the store of Harmon & Harmon, a span of mules valued at $300. Upon the death of S. W. Harmon, J. T. Harmon, his father and heir at law, succeeded to his property.

J. T. Harmon, about one and a half months prior to his death, made a gift of his property to his sons. He owned, at the time of his death, 80 acres of land, on which he lived, together with a horse and buggy, household goods and farming implements, in addition to the interest in the firm of Harmon & Harmon which he inherited as the heir of his son, S. W. Harmon.

The property of J. T. Harmon was divided among his sons as follows: The span of mules was given to Henry Harmon, which he accepted as his share in the property that came to his father through S. W. Harmon. The three other sons took the share of S. W. Harmon in the firm of Harmon & Harmon as their share. Soon after this division was made the three brothers, Frank, John and Silas, sold the interest which they owned in the firm of Harmon & Harmon to the other member of the firm, C. G. Harmon, for a consideration of $900, it being agreed that C. G. Harmon was to assume the indebtedness of the firm, which amounted to approximately the sum of $350. The consideration for this purchase was evidenced by two promissory notes of $450 each, executed by C. G. Harmon, and the notes were made payable to the heirs of S. W. Harmon. One of the notes was due December 10, 1914, and the other due December 10, 1915. They bore interest at the rate of 10 per cent. per annum. At the same time, to secure the payment of the notes, C. G. Harmon executed a mortgage conveying certain lands in Franklin County.

This suit was instituted by John Harmon and Frank Harmon against C. G. Harmon and Sarah E. Harmon, his wife, to recover on the notes and for a foreclosure of the mortgage given to secure the payment thereof if the indebtedness was not paid. The appellees set up the notes

and the mortgage and alleged that they had acquired the entire interest in the notes and were entitled to recover the amount due thereon. They set up that there were certain misdescriptions in the lands embraced in the mortgage which were the result of mutual mistake, and asked that the same be reformed and the mortgage foreclosed according to the correct description.

Appellant, C. G. Harmon, set up in defense, among other things, that it was mutually agreed between him and Harmon Brothers that the debt of their father, J. T. Harmon, to the firm of Harmon & Harmon should be canceled; that his wife joined him in the execution of the notes expressly upon such understanding; that it was further mutually understood and agreed between them, as a part of the consideration for the execution of the notes, that the four Harmon brothers would trade with C. G. Harmon, and that the amounts of their accounts, respectively, should be credited on the notes; that the notes were made payable to the heirs of S. W. Harmon, and the mortgage was executed to the heirs of S. W. Harmon; that he never heard before the suit was brought that the plaintiffs, John and Frank Harmon, claimed the notes; that when he made the payment credited on the note first maturing he made out the accounts of all the brothers who had been trading with him and deducted the sum total of their accounts from the face of the note with the interest on same added to the date of the credit, and offered the balance of $173.58 in full payment of the balance due on the note on which suit was instituted, but one of the plaintiffs refused to accept the same in full payment, but did receive the same as a credit. In further answer, he set up that since the institution of the suit Martha Harmon, the widow of J. T. Harmon, had intervened, setting up that she, as administratrix of the estate of J. T. Harmon, was the owner of the notes and entitled to collect the same, and has asked that whether she as intervener or the plaintiffs be entitled to recover that he have credit for the amounts due him for

merchandise on the accounts of Silas and Henry Harmon, according to the agreement that such sums should be credited on the note. He set up that plaintiffs were not innocent purchasers of the notes, and that said notes were not made payable to them, but to the heirs of S. W. Harmon, deceased; that J. T. Harmon, at the time of the death of S. W. Harmon, was the only heir of S. W. Harmon, and that he alone could pass title to the notes and mortgage, which he had not done. He further averred that after the credits which he claimed were entered upon the notes and the balance ascertained he was ready to pay the same to those who were legally entitled to receive it. Wherefore, he prayed to be discharged with his costs.

Martha Harmon, the wife of J. T. Harmon, intervened, setting up that she was the widow of J. T. Harmon, and had been appointed administratrix of his estate. She alleged that at the time of his death he owned an undivided interest in the mercantile business of Harmon & Harmon which he inherited as the sole heir of his son, S. W. Harmon, who died intestate and without issue, and that he was the owner in his own right of 80 acres of land and certain personal property, which she itemized; that the four brothers of S. W. Harmon, upon the death of their father, took advantage of her and took charge of all the property of J. T. Harmon and converted or attempted to convert the same to their own use, and that the personal property of his estate was worth approximately $1,500, which the plaintiffs and their brothers were seeking to convert, in addition to his household and kitchen furniture and 80 acres of land left as a home. She set up that she had a homestead interest in the land and a dower interest in the personal property, and prayed that the court, through proper orders, should protect her rights.

The above are substantially the issues, and facts as found by the court, upon which it allowed all credits on the note in suit that were indorsed thereon, and also the

accounts of John Harmon and Frank Harmon, and a credit of $31.57 for the sum expended by C. G. Harmon for improvements on the homestead, and the sum of $5.95 as taxes paid. After making these credits the court found that there was due plaintiffs on said notes $724.83. The court also found that there were certain mistakes in the description of the land in the mortgage which were mutual mistakes of fact, and proceeded to correct the description according to what the parties to the instrument intended, and entered a decree in favor of the appellees for the sum of $724.83, with interest, and ordered that the mortgage be reformed to correspond with the correct description as intended by the parties, and as reformed that the same be foreclosed and the property included therein be sold to satisfy the amount of the decree. The appellants have duly prosecuted this appeal.

WOOD, J., (after stating the facts). (1) The testimony bearing on the issues of fact in this case are exceedingly voluminous, and it could serve no useful purpose to set out and discuss the same in detail. After careful consideration of it we have reached the conclusion that J. T. Harmon, a few days after the death of his son, S. W. Harmon, gave to his other sons the property which he inherited from his son, S. W., and this gift was made complete by their accepting and taking possession of the property. The preponderance of the evidence tends to show that after the property was given to them by their father, something more than a month before his death, they took charge of the same and divided it among themselves. The gift from the father to the sons was an absolute gift *inter vivos;* although there is testimony tending to show that at the time the gift was made the donor was afflicted with an incurable malady and knew that he could not get well. Notwithstanding this fact, where the gift is made not in contemplation of death, but to take effect and become complete immediately upon the delivery, and the taking pos-

session of the property by the donee, the gift is one *inter vivos,* notwithstanding the donor may be upon his death bed. There is nothing in the testimony to warrant the conclusion that J. T. Harmon did not intend that the title to the property should pass to his four sons, the donees, during his life and immediately upon their taking possession of the same, which occurred, as above stated, something more than a month before his death.

This court, upon a thorough consideration of the essentials to constitute a gift *causa mortis* in *Hatcher* v. *Buford,* 60 Ark. 169, 176, said: "We think the better doctrine upon the transfer of the title to gifts *causa mortis* is that which accords with Justinian's definition, and recognizes the subject matter of the gift as becoming the property of the donee in the event of the donor's death. This seems to be the rule adopted by the English courts of chancery, and is supported also by eminent American courts and text writers." See also, *Ammon* v. *Martin,* 59 Ark. 191.

(2) When a gift is made by one who is afflicted with a fatal malady and who at the time of the making of the gift has no hope of recovery, and where the gift is made in contemplation of the near approach of death the presumption is that such gift was *causa mortis,* but this presumption may be overcome by proof to the contrary, and such was the case here.

In the same case (*Hatcher* v. *Buford, supra*), after recognizing the above doctrine, we said: "But it must not be forgotten that an absolute gift when *inter vivos* may be made by one upon his deathbed, and who is aware of the near approach of death from the ailment."

In *Lowe* v. *Hart,* 93 Ark. 548, this court said: "Where a holder of a certificate of deposit intended as he handed it to another to pass title immediately, and the latter accepted it as her own, the gift was *inter vivos,* though the donor knew he was about to die."

(3) This disposes of the issue raised by the intervention of Mrs. Martha Harmon, as administratrix of

the estate of J. T. Harmon, deceased, and also of her individual claim for dower. The gift by J. T. Harmon of the property inherited by him from his son, S. W. Harmon, to his other four sons being one *inter vivos,* his widow has no rights therein either as administratrix or in her own right as widow.

(4) The next question is, did the Harmon brothers, the donees of the interest of S. W. Harmon, in the business of Harmon & Harmon, as an inducement to C. G. Harmon to buy their interest in such business, agree that they would trade with him and that their respective accounts should be credited on the notes. This was purely an issue of fact, and it would greatly lengthen this opinion to discuss the testimony in detail bearing upon it. After a careful consideration of the testimony on this issue, we have reached the conclusion that the preponderance of the evidence shows that there was no such agreement. But even if there was such an agreement, the appellant could not enforce it in this suit, for the reason that the Harmon brothers and the appellant reduced their contract concerning this purchase to writing and evidenced the amount that was to be paid in consideration for the purchase by a promissory note. To permit appellant to prove that a plain promissory note, payable under the law in money, was, under the terms of a contemporaneous parol agreement, to be paid partly in merchandise would be to violate the rule which prohibits the production of parol evidence to vary or contradict the terms of a written contract. Such is the effect of the decisions of this court and of the authorities generally. *Borden* v. *Peay,* 20 Ark. 293; *Bishop* v. *Dillard,* 49 Ark. 285; *Tisdale* v. *Mallett,* 73 Ark. 431, and other cases cited in appellees brief.

The preponderance of the evidence shows that the appellees John and Frank Harmon were innocent holders for value of the notes in suit. The testimony showed that the other brothers had transferred before maturity for value, their interest to the appellees. The court heard

oral testimony on this issue and the testimony shows that the appellees held receipts from the other brothers showing that Silas and Henry Harmon had assigned their interest to the appellees.

There is no error in the decree of the court and the same is therefor affirmed.