## LEHMAN *v.* BROYLES.

Opinion delivered November 20, 1922.

1. APPEAL AND ERROR—CONCLUSIVENESS OF COURT'S FINDING OF FACTS. A finding of fact by a trial court sitting as a jury is as conclusive on appeal as would be the verdict of a jury, and will not be disturbed where there is substantial evidence to support it.

2. GIFTS—DEPOSIT IN BANK—DELIVERY.—In a suit for funds deposited in a bank to plaintiff's credit by decedent, who delivered the pass book to plaintiff, telling her that it was her money and that he was making the deposit for her, *held* sufficient to sustain a finding of a delivery and acceptance, necessary to constitute a gift *inter vivos.*

Appeal from Washington Circuit Court; *W. A. Dickson*, Judge; affirmed.

*John Mayes,* for appellant.

The appellee has utterly failed to show a delivery to her, symbolical or otherwise, of the money in controversy, or the delivery and possession of the pass book.

It is well-established law that gifts, either *causa mortis* or *inter vivos,* must show an actual delivery by the donor to the donee of the property intended to be given, as well as the circumstances under which either must be consummated. 44 Ark. 45; 107 U. S. 602; 114 Mass. 30; 43 Ark. 307; 1 Ark. 83; 6 Ark. 538.

There were no instructions or directions given by Mr. Lehman to the bank, at any time, for the bank to deliver this money to appellee.

One can make a lawful gift *inter vivos* of his property, provided the gift is complete, *i. e.,* that the donor parts with all control of it, and reserves no right to recall it, and intends it to be a final disposition of the property. 147 Ala. 311; 3 L. R. A. (N. S.) 774; 40 So. 104; 10 Ann. Cas. 1051; 68 Ark. 255; 58 S. W. 42; 113 Cal. 490; 45 Pac. 867; 176 Pac. 56; 52 Ind. 393; 137 Iowa 742; 115 N. W. 590; 28 Atl. 9; 144 Pac. 1094. Delivery to an agent or trustee for the use of the donee is sufficient to vest title in the donee. 138 Iowa 344; 116 N. W. 119; 151 Iowa 362; 130 N. W. 125.

Where property intended to be given to a third person for delivery to the donee, although the right of revocation existed, but was not exercised prior to the death of the donor, the title vested in the donee. 173 Iowa 165; 155 N. W. 283; 51 Vt. 227; 31 Am. Rep. 682; 179 Ill. 137; 53 N. E. 584.

There was no delivery or surrender of dominion of the property by the appellant. 138 Mass. 581; 192 Mass. 564; 116 Am. St. Rep. 270; 78 Neb. 648; 141 Mo. 642; 43 S. W. 617; 42 Mo. App. 49; 125 Mo. App. 165; 101 S. W. 1108.

*Walker & Walker,* for appellee.

Where the judgment of a court sitting as a jury is based upon substantial testimony, its judgment will not be disturbed on appeal. 38 Ark. 139; 45 Ark. 41; 50 Ark. 305; 53 Ark. 161; 56 Ark. 621; 68 Ark. 83.

Findings of fact by a court sitting as a jury are as conclusive as the verdict of a jury, and will not dis-

turbed if there be evidence to support them. 90 Ark. 512; 91 Ark. 108; 92 Ark. 41; 90 Ark. 494; 90 Ark. 375; 100 Ark. 166; 86 Ark. 504; 80 Ark. 47; 82 Ark. 188; 84 Ark. 623; 97 Ark. 374; 80 Ark. 249; 96 Ark. 606; 114 Ark. 170; 171 S. W. 924; 111 Ark. 190.

WOOD, J. The appellee instituted this action in the circuit court of Washington County against the Arkansas National Bank of Fayetteville, Arkansas (hereafter called bank), to recover the sum of $3,366 with interest thereon at four per cent. from the 30th day of June, 1918. She alleged that the money was deposited with the bank to her credit by William Lehman, who had legally adopted the appellee as his daughter. The appellants filed an intervention alleging that they were the sole surviving heirs of William Lehman; that the money on deposit in the bank was the property of William Lehman, and at his death they became entitled to same as his only heirs. They denied that the appellee was the legally adopted daughter of William Lehman, and denied that she was entitled to the money in controversy. On the 29th of October, 1921, the bank paid to the clerk of the court the sum of $3,366, and by consent of all parties was discharged from further liability.

The appellee testified that she was the adopted daughter of William Lehman, deceased. Her father, William Lehman, delivered to her a bank deposit book and made her a present of some money in the bank, which book she introduced in evidence. When the book was delivered to her it showed a deposit of $600. When her father delivered the book to her he told her that was her money. William Lehman, her adopted father, had no child of his own. At the time he delivered the book to witness his wife was dead. From time to time after he first delivered the book to witness he called upon witness for the book and made other deposits, and told witness they were hers. Witness was the owner of the money in controversy, and had made demand on the bank for same, and instituted this action because the bank refused

to pay the money over to her. Witness further testified that she had not checked against the deposit during the . life-time of her father; that he said, "I am making a deposit for you. You don't really need this money now. It might be that later you will need it." The bank book had been in her possession at all times since it was first delivered to her by her father, except at such times as her father called for it when he desired to make additional deposits. Her father was 68 or 70 years old at the time of his death. At one time during his life she loaned him $500, and he gave her his note for it. Numbers and numbers of times before that her father had given her money, and she had always had a bank account with the bank, and also had an account with the First National Bank. The $500 she loaned her father was in the First National Bank. She checked it out and delivered the money to him. The reason she did not have her father pay the $500 when he was depositing the money to her credit was that she did not need it. He always looked out for witness' welfare—anything she needed. She didn't ask her father for interest on the note. She left the $500 note and mortgage in her father's box for safekeeping at his suggestion. She knew nothing about her father making a deposit for her to avoid any judgment that might be obtained by the woman he had married in Texas. Her father had given her the money; that was all she knew. Her father had considerable money in the bank in his own name, which came into the hands of Mr. Wilson, his administrator. Her father had in his box, which she opened, vendor's lien notes amounting to thousands of dollars on property in Texas. She turned over the box to the administrator. Her father was stricken with paralysis at the home of Mrs. Collins.

T. L. Hart testified that he was cashier of the bank. The book exhibited and introduced is a savings pass book issued by the bank to Mrs. Ethel Broyles. The book gives a correct record of the amount of money deposited by William Lehman and the withdrawals from

same which were charged to the account of Mrs. Ethel
Broyles. William Lehman was dead. The withdrawals
from the fund were by checks drawn by William Lehman.
He made the last withdrawal in May before his death,
amounting to $100. Witness had no instructions to
honor appellee's drafts against the account—had instruc-
tions not to honor checks drawn by her. Witness further
stated that, while Lehman did not tell him definitely when
he made the deposit, witness drew the presumption that
he had some fears that some woman may be molesting
his estate or his funds, and he said that he wanted that
in such a shape that his daughter, Mrs. Broyles, would
have no trouble after his death, but at the same time he
reserved the right to control the fund as he saw fit.
Witness was asked whether or not he had any authority
from Mrs. Broyles to check against that account, and
answered, "Well, we had no instructions from Mrs.
Broyles either way." Mrs. Broyles brought the bank book
in after her father's death and had witness to bring it
down to date with the amount of accrued interest at that
time. Witness further testified that he did not know
where Lehman kept his pass book. He would bring the
book with him when he made a deposit. He could not
say that he had the book with him every time, but several
times he did. Witness could not recall the exact words
of Lehman in regard to the money but he said, "I want
this money so no one can molest it." Thus in a scatter-
ing way he led witness to believe he was apprehensive
that somebody would try to get it. Witness did not re-
member whether Lehman had other money on deposit at
that time, but thinks that is all he had. Witness had been
unable to find any checks against the deposit except one.
Witness exhibited this check, which was as follows:

"Muskogee, Okla. 5-3-21.

"Pay to the order of S. S. Gill, Trustee, $100.00, one hundred no/100 dollars.

"Endorsed by payee, this check becomes a receipt in full for account as per statement below.

"Arkansas National Bank, Fayetteville, Arkansas.

"Chg. Ethel Broyles.

"W. M. LEHMAN."

The words "Charge Ethel Broyles" on the draft were put there by witness. Witness didn't know about that particular check or draft, but it was witness' understanding when Lehman made the deposit that he would control it and withdraw from it as he saw fit. He wanted it there so when he died it would be in such a shape that "she wouldn't have any trouble in getting it. That was about the sum and substance of it."

The appellee was recalled and testified that when her father was making deposits he would say to her, "This is for you," and a few times he said, "I am going to check on this, will that be all right?" She replied, "Perfectly all right. Any time you need any money don't save anything for me that you might need yourself —use it."

There was testimony on behalf of the appellee to the effect that the relations between William Lehman and the appellee before and up to the time of Lehman's death were pleasant. William Lehman died at Fayetteville. At that time the appellee was living in Joplin, Missouri.

We deem it unnecessary to set out the testimony that was introduced on behalf of the appellants, the interveners, and also the testimony that was introduced on behalf of the appellee on the issue as to whether or not she was the legally adopted daughter of William Lehman. The court made a general finding in favor of the appellee on all the issues, and in the view we have of the case it becomes wholly unnecessary to set forth any testimony except that already stated, for the reason that

the appellant contends that the above testimony was not sufficient to show that there was a gift *inter vivos* of the money by Lehman to the appellee. If the above testimony is sufficient to sustain the finding of the court that the money in controversy was given by William Lehman to the appellee, then all other questions pass out.

The law is well settled that the finding of fact of a circuit court sitting as a jury is as conclusive on appeal as would be the verdict of a jury, and the verdict of a jury on appeal will not be disturbed where there is substantial evidence to support it. See *Rush* v. *Citizens' National Bank,* 114 Ark. 170; *Greenspan* v. *Miller,* 111 Ark. 190; *Williams* v. *Board of Directors,* 100 Ark. 166, and many cases cited in appellee's brief.

No declarations of law were asked or made by the trial court, and the only question, therefore, for our determination is whether or not the above testimony, giving it its strongest probative force in favor of the appellee, was sufficient in law to constitute a gift *inter vivos* between Lehman and the appellee. In *Lowe* v. *Hart,* 93 Ark. 548, the facts were somewhat similar concerning the delivery of money to the facts here. In that case one Carroll, the donor, handed to Mrs. Hart, the donee a certificate of deposit and said, "Here is a check for my money." On another occasion he was at the hospital and was told that he might die, and was asked what he was going to do with his money, and his reply was, "John Hart's folks will know what to do with my stuff." Commenting upon these facts, we said: "If Carroll intended at the time he handed the certificate to Mrs. Hart to immediately pass to her the title and the right to draw his money on deposit, as the above evidence tends to show, and if she accepted it as her own, then the intention on his part to give, and on her part to accept, accompanied by delivery of the certificate for the purpose indicated, would constitute an absolute gift *inter vivos.* Citing *Ammon* v. *Martin,* 59 Ark. 191." See, also, *Nolen* v.

*Harden,* 43 Ark. 307, 318-19; *Harmon* v. *Harmon,* 131 Ark. 501-506; *King* v. *Allen,* 132 Ark. 54.

In the recent case of *Gordon* v. *Clark,* 149 Ark. 173, we held that the delivery to another by a depositor of a bank book showing the amount of the deposits would not be a delivery so as to pass title from the depositor to the person to whom the book was delivered. But the case at bar is entirely different from that, because here the deposits were made and entered in the bank book, not in the name of Lehman, the depositor, but in the name of appellee herself. "The savings pass book" says the cashier, "was issued by the bank to Mrs. Ethel Broyles."

Now it occurs to us that the facts of the present record are fully as convincing of the intention of Lehman to give the appellee the money in controversy and of appellee to accept the same as were the facts in the case of *Lowe* v. *Hart, supra.* The court manifestly found that Lehman gave the appellee the bank book intending to vest in her the funds in controversy, and that she accepted the gifts. At least, a general finding would include a specific finding to that effect, and, even though we might have rendered a different verdict on the facts if we had been sitting as jurors, yet under well established rules of this court we cannot disturb the verdict or finding of the trial court where there is any legal evidence to sustain it. *Lowe* v. *Hart, supra,* and cases there cited at pages 561-2.

The court might have found from the testimony of appellee that Lehman delivered to the appellee the bank savings deposit book, showing deposits in her name, with the intention of vesting title *in praesenti* in the appellee, and that the appellee accepted the gift as her own. Such a finding would constitute in law a gift *inter vivos.*

The judgment is therefore correct, and it is affirmed.